THERMO ELECTRON CORPORATION *vs.* WASTE MANAGEMENT
HOLDINGS, INC.

No. 03-P-1017.

Middlesex. June 4, 2004. – March 25, 2005.

Present: GRASSO, COWIN, & MILLS, JJ.

*Guaranty. Contract,* Construction of contract, Assignment. *Collateral Estoppel. Notice. Practice, Civil,* Motion to amend, Counterclaim and cross-claim.

The plain language of a guarantee, which bound the defendant, a parent corporation, to the payment of all sums due from the parent's subsidiary to the plaintiff under a certain contract, also bound the parent to the payment of any obligations incurred by the company to whom the subsidiary later assigned the contract, where the assignment occurred as part of an asset sale that the parent effectively controlled and of necessity assented to, and where the assignment did not increase the parent's risk in any way that the parent could not have reasonably anticipated [197-200]; further, once the assignee, after assuming the contractual obligations in question and becoming the principal obligor for purposes of the parent's guarantee, fully participated with the plaintiff in an arbitration arising out of the performance of the contract, the parent was bound by the arbitration's result [200-201].

The defendant in a contract action failed to demonstrate a plausible ground for asserting that an otherwise timely default notice did not sufficiently comply with mandatory notice requirements set forth in the contract. [201-202]

A motion judge did not abuse his discretion in denying a defendant's motion to amend its answer to assert a counterclaim, where the motion was offered at a relatively late stage of the litigation, suggesting the possibility of prejudice to the plaintiff, and where the proposed counterclaim would have been futile. [202-203]

CIVIL ACTION commenced in the Superior Court Department on July 17, 2001.

A motion to amend was heard by *Raymond J. Brassard,* J., and the case was heard by him on motions for summary judgment.

*James F. Kavanaugh, Jr. (Kurt B. Fliegauf* with him) for the defendant.

*Samuel M. Starr* (*David Hadas* with him) for the plaintiff.

COWIN, J. The defendant, Waste Management Holdings, Inc. (WMH), appeals from a summary judgment entered by a judge of the Superior Court in favor of the plaintiff, Thermo Electron Corporation (Thermo), in its action to enforce WMH's guarantee. The underlying facts are not disputed. On December 22, 1994, Thermo and Rust International Corporation (Rust), a majority owned subsidiary of WMH (then known as WMX Technologies, Inc.), entered into an Engineering, Procurement and Construction Agreement (the EPC agreement) whereby Rust agreed, as a subcontractor, to construct for Thermo a de-inking pulp facility in Menominee, Michigan. As a condition of entering into the subcontract, Thermo received from Rust's parent corporation, now WMH, a guarantee in which WMH guaranteed "the full, faithful and punctual payment, and not merely collection, when due, whether by acceleration or otherwise, of all sums (including all interest) which hereafter become due from Rust to Thermo under and pursuant to the [EPC] Agreement." The EPC agreement provides, in this regard, that Rust would make certain payments to WMH as consideration for the guarantee, and that Thermo would in turn "reimburse" Rust for such payments in the amount of $250,000 for each year that the guarantee was in effect.

On May 20, 1996, in accordance with an asset purchase agreement, Rust sold certain assets and assigned certain contracts, including the EPC agreement, to Raytheon Engineers & Constructors, Inc. (Raytheon). Raytheon also purchased Rust's trademarks, service marks, and the name "Rust." In November, 1996, a major component of the waste water treatment plant at the de-inking pulp facility failed. Subsequently, Thermo, Raytheon, and a third party arbitrated the issues of liability and apportionment of damages arising from the failure of the plant. While Rust was not a party to the arbitration, it knew that it was taking place by virtue of its receipt of a subpoena served during discovery; furthermore, several former Rust employees testified during the proceeding. Ultimately, the arbitrators concluded that Rust had breached its design warranty and that Raytheon, having acquired Rust's liability, was liable for Thermo's damages in the amount of $3,823,545.

Raytheon paid Thermo a total of $2,567,757, thereafter entering bankruptcy proceedings. Thermo thereupon made a demand on WMH to pay the outstanding balance of the arbitration award pursuant to its guarantee and thereafter commenced this action. Meanwhile, the arbitration award was confirmed by the United States District Court, with judgment thereon, plus interest, entering in favor of Thermo in the amount of $1,364,370.18. WMH denied liability under the guarantee. Subsequently, Rust and WMH entered into an agreement whereby Rust assigned to WMH all of its rights against Thermo for reimbursement of payments by Rust for the guarantee (i.e., the payments of $250,000 per year while the guarantee was in effect). WMH then sought to amend its answer in the present case with a counterclaim alleging breach of contract by Thermo for its alleged failure to make the reimbursement payments to Rust. WMH's motion to amend was denied. On cross motions for summary judgment, the judge allowed Thermo's motion and denied WMH's motion. This appeal by WMH followed. We affirm.

WMH attacks the summary judgment decision on four separate grounds, specifically (1) the language of the guarantee limits WMH's liability to obligations incurred by Rust, not by Rust's assignee; (2) Rust, and therefore WMH, are not bound by the outcome of the arbitration because Rust was not a party to that proceeding; (3) Thermo failed to give required timely notice of its claims; and (4) it was error to deny WMH's motion to amend its answer to assert a claim against Thermo for nonpayment of the guarantee fee reimbursements.[1] We consider these propositions in the order in which they were asserted by WMH.

1. *The guarantee.* WMH begins by focusing on the language of the guarantee, particularly that portion that binds WMH to the payment, when due, of all sums "which hereafter become

---

[1] WMH's formulation of the issues on appeal differs somewhat from its formulation in connection with the summary judgment case in the Superior Court. To the extent that issues addressed by the motion judge, such as the possible release of WMH's obligations under the guarantee by virtue of Rust's assignment of the EPC agreement to Raytheon, or a possible discharge of those obligations because of a novation of the EPC agreement, have not been addressed by WMH on appeal, we treat them as waived.

due from Rust to Thermo under and pursuant to the [EPC] Agreement." WMH argues that the plain meaning of the words is that the guarantee applies only to obligations incurred by Rust itself, and thus has no bearing on the obligations incurred by a stranger (in this case, the assignee, Raytheon). More specifically, WMH does not contend that the assignment of the EPC agreement by Rust discharged WMH's obligations under the guarantee; rather, WMH acknowledges the continuing force of the guarantee, but asserts that, by its terms, it does not apply to an obligation incurred not by Rust, but by Raytheon. Thus, WMH continues, parol evidence to the effect that the parties intended that the guarantee apply to the obligations of Rust's assignee cannot properly be employed to vary what is otherwise the plain guarantee language.

We believe, however, that WMH's literal construction of the guarantee ignores several elements that lead to an opposite conclusion. The parties agree that the guarantee in this instance is governed by Illinois law, and the motion judge applied that law in arriving at his conclusion that the guarantee applied to the Raytheon obligation. Illinois law quite plainly provides that "a guarantor is not released [by an assignment by the principal] unless the essentials of the original contract have been changed and the performance required of the principal is materially different from that first contemplated." *Roels* v. *Drew Indus., Inc.*, 240 Ill. App. 3d 578, 581 (1992). While the *Roels* decision involved the change of identity of the principal obligor by means of a merger, its holding is equally applicable to the present circumstances where a contract from which the principal obligation arises is transferred to another by means of an asset sale, but the risk to the guarantor is not increased. That is certainly true where, as here, the guarantor, the majority owner of the principal obligor, of necessity must have assented to the sale and accompanying assignment. "[W]here a guarantor assents to a change in the contract, he will not be released." *Id.* at 583.

In the present case, there is no basis for concluding that WMH's risk was increased by the assignment of the contract to Raytheon in any way that WMH could not reasonably have anticipated. Rust, a majority of whose stock was owned by

WMH, could not have entered into the asset sale and the assignment of the EPC agreement without at least the tacit approval of its parent. Thus, if indeed there were any increase in the guarantor's risk by virtue of the transfer of responsibility for performance from Rust to Raytheon, an assumption not borne out by the record,[2] WMH must be held to have assented to such increased risk by allowing its subsidiary to effect the assignment. This avoids the unacceptable alternative that a parent corporation that guarantees a debt of its subsidiary can relieve itself of liability under the guarantee merely by causing its subsidiary to assign away the contract from which the guaranteed debt arises.

We observe also that other documentation does not support the restricted reading of the guarantee pressed by WMH. In the asset purchase agreement that resulted in the assignment to Raytheon of the EPC agreement, it is provided, in paragraph 8.7 thereof, that "[Raytheon] agrees to use commercially reasonable efforts . . . includ[ing] the provision of substitute security of like character, quality and amount, to obtain the release of the Sellers, Rust, WMX [now WMH] and their Affiliates from those Support Agreements indicated as 'To Be Released' on Schedule 8.7." Among the support agreements listed is the guarantee of Rust's obligations under the EPC agreement. It follows that the parties to the asset purchase agreement fully anticipated that, absent further action, the WMH guarantee was among the assets that were being sold in the transaction. Indeed, it could hardly have been otherwise, given the fact that Thermo's assent to the assignment was apparently neither sought nor obtained.[3]

Contrary to WMH's suggestion, the motion judge did not rely on parol evidence in order to interpret the guarantee, nor

---

[2]The arbitration panel concluded that Rust had breached its design warranty well before the assignment of the contract to Raytheon.

[3]That Thermo, a party to the EPC agreement and the beneficiary of the guarantee, did not assent to the assignment of that agreement might render the assignment invalid as to Thermo, thus leaving the legal status unchanged, i.e., Thermo and Rust remained the contracting parties, with Rust's obligations still guaranteed by WMH. On the other hand, Thermo appears to have acknowledged the assignment at least in practice, leaving its expectations regarding the survival of the guarantee in doubt. There is evidence that Thermo viewed Raytheon as a successor to Rust. In light of our other conclusions, it is not necessary to decide the issue.

do we. Likewise, the decision does not turn on the language of the guarantee that "[t]he Guarantor's liability hereunder shall be unaffected by . . . any change in the corporate existence, structure or ownership of Rust." We doubt, in any event, that an asset sale would qualify as a change of corporate existence, structure or ownership. We rely instead, as did the motion judge, on Illinois authority and on the fact that the guarantor effectively controlled the assignment that it now contends should discharge its obligation.

2. *The arbitration.* WMH argues alternatively that, even if it continued to be bound by the guarantee following Rust's assignment of the EPC agreement to Raytheon, it is not collaterally estopped from contesting that Rust breached the agreement or the amount of damages incurred because those claims were adjudicated in an arbitration to which Rust was not a party. In other words, WMH asserts that it is not bound by the result of the arbitration, and that it retains the right to challenge both the proposition that Rust breached the EPC agreement (thereby implicating WMH's guarantee) and the amount of damages awarded.

On its part, Thermo argues, and the motion judge agreed, that, even were the guarantee limited to the obligations of Rust, Rust (and therefore WMH) are bound by the result of the arbitration because sufficient privity existed between Rust-WMH and Raytheon that considerations of due process are not offended. See *Gonzalez* v. *Banco Cent. Corp.*, 27 F.3d 751, 757 n.4 (1st Cir. 1994); *Tuper* v. *North Adams Ambulance Serv., Inc.*, 428 Mass. 132, 134 (1998). We do not dismiss the possibility that, in the circumstances, privity between Rust and Raytheon could be found to exist, although we acknowledge that an assignor is not ordinarily bound by a subsequent judgment entered against an assignee. See Restatement (Second) of Judgments § 55 (1982). Nor does an identity of interests by itself create privity. See *Sarvis* v. *Boston Safe Deposit & Trust Co.*, 47 Mass. App. Ct. 86, 100 (1999).[4]

It is, however, unnecessary to wrestle with the complexities of privity on this record. As we stated in part 1, *supra,* the

---

[4]For the reasons stated *infra*, we also do not rely on the doctrine of virtual representation, see *Bourque* v. *Cape Southport Assocs.*, 60 Mass. App. Ct.

assignment of the EPC agreement as part of a sale of assets by Rust to Raytheon included an understanding, in which WMH of necessity joined, that the guarantee would thereafter apply to obligations incurred by Raytheon in connection with its performance of the contract. That being the case, Rust's participation, or lack thereof, in the arbitration becomes of no consequence. Raytheon, which had assumed the contractual obligations in question, and which was now the principal obligor for purposes of the guarantee, fully participated in the arbitration. It is bound by the result, as is its guarantor.

3. *Notice of claims.* WMH argues that Thermo is barred from making any claims against the guarantee because it failed to give Rust timely notice of the design defects for which it sought recovery. Accordingly, WMH asserts that it was entitled to summary judgment in its favor because Thermo would be unable to present evidence that it in fact complied with mandatory notice requirements. On this issue, WMH relies on language in the EPC agreement to the effect that Rust makes no warranty with respect to any breach not reported to it within thirty days after the expiration of the design warranty period. WMH's contention that notice was not timely is based on the premise that the Thermo notice addressed to "Raytheon Engineers & Constructors (Rust Division)" did not comply with the contractual requirement that notice be sent to "Rust International Corporation (Delaware)."[5] WMH does not contend that no timely notice at all was sent, only that the entity to which notice was directed was incorrect.

The motion judge was concerned that the record contained no evidence that a notice was actually sent by Thermo and received by Rust. WMH, however, does not appear to contend that notice was not sent or received, restricting its argument to the proposition that the notice failed to comply with contractual requirements governing how it should be addressed. The judge did not treat the issue of the adequacy of the notice, concluding instead

271, 275-276 (2004), though a plausible argument based on that theory might be made in this case.

[5]The street address to which Thermo sent notice was that called for in the EPC agreement because Raytheon had leased a portion of Rust's former headquarters.

that Thermo's right to recover had been conclusively established by the result of the arbitration, with any objection regarding notice having thereby been adjudicated. He determined as well that any requirement of a default notice to Rust had been expressly waived by WMH in the guarantee.

We need not address the grounds relied on by the motion judge. Thermo sent timely notice to the address specified in the EPC agreement. The difference between the requirement of the EPC agreement that notice be addressed to "Rust International Corporation (Delaware), 100 Corporate Parkway, P.O. Box 101, Birmingham, Alabama 35242, Attention: Mr. Thomas A. Robicheaux" and Thermo's actual notice[6] to "Thomas A. Robicheaux, Raytheon Engineers & Constructors (Rust Division), 100 Corporate Parkway, Birmingham, Alabama 35242" is de minimis, and falls far short of a plausible ground for asserting that an otherwise timely default notice was insufficient.

4. *The counterclaim.* We affirm as well the motion judge's order denying WMH's motion to amend its answer to assert a counterclaim for unpaid guarantee fee reimbursements. Rust's claim for reimbursements was assigned to WMH subsequent to Rust's assignment of the EPC agreement to Raytheon. That being the case, it appears that the accompanying right to have the guarantee fee reimbursed had also been assigned, leaving Rust no extant claim it could assign to WMH. Furthermore, the motion to amend the answer was offered at a relatively advanced stage of the litigation, suggesting the possibility of prejudice to Thermo. The judge could have denied the motion for either reason.

He chose, however, to address the merits, and, in our view, did so correctly. The EPC agreement provides, in Article 24, that Rust shall make certain payments to WMH (then WMX) in consideration for the guarantee. The article goes on to provide that "Thermo shall reimburse [Rust] for such payments in the amount of $250,000 for each year that the [WMH] Guarantee remains in effect." We agree with the judge that the term "reimburse" has an accepted meaning, implying that the obligee has earlier paid or advanced funds, and that the obligor will

---

[6]The notice was apparently sent by facsimile transmission. WMH does not challenge the transmission method.

then pay to the obligee an equivalent amount. There being no evidence that Rust made any payments at all to its parent WMH for the guarantee, and the burden being on WMH to prove that fact,[7] WMH could not have established the validity of its counterclaim. The proposed counterclaim being futile, the judge did not abuse his discretion in denying the amendment. See *Leonard* v. *Brimfield*, 423 Mass. 152, 157 (1996).

*Judgment affirmed.*

---

[7]The parties agree that Michigan law governs the EPC agreement. Payment by Rust to WMH of the guarantee fee was a condition precedent to the obligation of Thermo to reimburse. See *MacDonald* v. *Perry*, 342 Mich. 578, 586 (1955). The party seeking to enforce the conditioned obligation, here WMH, has the burden of proving that the condition was satisfied. See *Valley Natl. Bank* v. *Kline*, 108 Mich. App. 133, 138 (1981).