89 F.3d 5
 39 U.S.P.Q.2d 1556
 STAR FINANCIAL SERVICES, INC., d/b/a Star Mortgage,
Plaintiff, Appellee,
v.
AASTAR MORTGAGE CORP., a/k/a Astar Mortgage Corp.,
Defendant, Appellant.
STAR FINANCIAL SERVICES, INC., d/b/a Star Mortgage,
Plaintiff, Appellant,
v.
AASTAR MORTGAGE CORP., a/k/a Astar Mortgage Corp.,
Defendant, Appellee.
 Nos. 95-2289, 96-1323.
 United States Court of Appeals,
First Circuit.
 Heard May 10, 1996.
Decided July 16, 1996.
 
 Philip X. Murray with whom Lorusso & Loud, was on brief, Boston, MA, for Aastar Mortgage Corp.
 Gary E. Lambert with whom Lambert & Ricci, P.C., was on brief, Boston, MA, for Star Financial Services, Inc.
 Before TORRUELLA, Chief Judge, STAHL and LYNCH, Circuit Judges.
 STAHL, Circuit Judge.
 
 
 1
 Star Financial Services, d/b/a Star Mortgage ("STAR") brought an action against Aastar Mortgage Corporation ("AASTAR") alleging, inter alia, service mark infringement and unfair trade practices. A jury agreed that AASTAR had unlawfully infringed on STAR's service mark under both federal and Massachusetts law. Nonetheless, it awarded no damages on the infringement claims. Based upon the finding of infringement, the jury also returned a verdict in favor of STAR on the unfair practices claim, Mass. Gen. L. ch. 93A §§ 2 and 11.
 
 
 2
 Following trial, the court permanently enjoined AASTAR from any future reference to itself as "AASTAR" and ordered certain additional remedial action. Pursuant to Mass. Gen. L. ch. 93A § 11, the court also awarded fees to STAR's attorneys. Shortly thereafter, the court found AASTAR to be in civil contempt for violating the injunction and awarded attorneys' fees and costs to STAR stemming from the contempt proceedings.
 
 
 3
 Both parties appeal. AASTAR contends that the district court erred in denying its motion for judgment as a matter of law, denying its request for a trial continuance, holding AASTAR in civil contempt and awarding attorneys' fees. STAR appeals the court's reduction in the requested amount of attorneys' fees. Addressing these contentions in turn (providing facts as necessary), we affirm the district court in all respects.
 
 I.
 
 4
 Denial of Motion for Judgment As a Matter of Law
 
 A. Standard of Review
 
 5
 AASTAR argues that STAR failed to produce evidence sufficient to establish service mark infringement[1] by a preponderance of the evidence and, thus, the court should have granted its motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a) & (b).[2] We review the court's denial of the Rule 50 motion de novo, examining the evidence in the light most favorable to the nonmovant, STAR. Golden Rule Ins. Co. v. Atallah, 45 F.3d 512, 516 (1st Cir.1995). "[W]e may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir.1987). Reversal of the denial of the motion is warranted "only if the facts and inferences 'point so strongly and overwhelmingly in favor of the movant' that a reasonable jury could not have reached a verdict against that party." Atallah, 45 F.3d at 516 (quoting Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir.1993)). Thus, we present the facts in the light most favorable to STAR as the jury could have found them.
 
 B. Facts
 
 6
 STAR is in the business of "mortgage originating"; it receives information from individuals seeking real estate mortgage loans, completes applications with that information, and then searches the secondary market for a lender willing to offer the mortgage sought. STAR has operated throughout Massachusetts since its incorporation in 1993.
 
 
 7
 In January 1994, STAR registered its service mark (which it had used since the time of its incorporation) with the Massachusetts Secretary of State. At that time, STAR also applied for, and eventually received, a federal registration of the mark. The mark consisted of the word "STAR" in bold, capital letters with a five-point star symbol in the upper portion of the letter "R" and the word "MORTGAGE" in smaller capital letters beneath the word "STAR."STAR used the mark in all of its advertising. It spent about $2,000 per month (of its $5,000 monthly advertising budget) for advertisements in the Suburban Real Estate News ("The Suburban "), a free publication about real estate issued in several regional editions (e.g., north, west, south) and distributed throughout Massachusetts. STAR's advertisements in The Suburban typically touted, inter alia, access to various mortgage programs, favorable interest rates, low closing costs, timely credit approval and low down payments.
 
 
 8
 In May 1994, AASTAR commenced offering mortgage originating services in the Massachusetts area. It also placed advertisements in The Suburban that, like STAR's advertisements, promised a variety of mortgage programs, favorable interest rates, low closing costs and timely approvals. These advertisements typically would include a "closing cost certificate" to be clipped out, entitling the bearer to a $500.00 credit toward closing costs.
 
 
 9
 AASTAR's advertisements contained the business name "AASTAR MORTGAGE CORP." in bold, capital letters. Its first advertisement in The Suburban depicted a five-point star symbol superimposed over the first "A" in "AASTAR." At one time, AASTAR's business cards also depicted the star symbol in that same letter, but eventually the symbol was moved to the third and last "A" in "AASTAR."
 
 
 10
 STAR's president, Jay Austin, noticed AASTAR's advertisement in a May 1994 edition of The Suburban. He then wrote various letters to AASTAR's officers, informing them of his registered mark, requesting them to cease business operations under the "AASTAR" name and advising them to take various remedial actions. AASTAR did not respond.
 
 
 11
 Actual customers confused the two mortgage originating companies. In November 1995, a STAR customer who had already completed an application walked into the STAR office with a copy of The Suburban and asked why she was not offered the rate advertised. Austin explained that AASTAR, not STAR, was advertising that rate. On another occasion, a customer who had completed an application at STAR returned to its office with AASTAR's closing-cost coupon and, believing the advertisement was for STAR's services, asked for the $500 credit. On yet a different occasion in July 1994, a customer had almost completed an application when she presented the STAR loan originator with AASTAR's $500 coupon. The loan originator explained that the customer had confused the two companies, and after conferring with a supervisor, credited the customer the $500.
 
 
 12
 Potential customers also confused the two companies. Austin would call individuals who had placed an initial call to STAR to inquire into its services; several times during these follow-up calls, the individual would indicate that he or she had "already" completed an application with STAR. When the person's name did not appear in STAR's records, Austin would call again to inquire if the person was "sure" the application was with STAR; the response would be affirmative. Austin would then inquire if it was with "AASTAR" or "STAR"; at this point the person would indicate, "oh, it was AASTAR."
 
 C. Discussion
 
 13
 The purpose of trademark laws is to prevent the use of the same or similar marks in a way that confuses the public about the actual source of the goods or service. DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 605 (1st Cir.1992), cert. denied, 509 U.S. 923, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993). Confusion about source exists when a buyer is likely to purchase one product in the belief she was buying another and is thus potentially prevented from obtaining the product she actually wants. Id.
 
 
 14
 To prevail in an action for trademark (or service mark) infringement, the plaintiff must establish: "1) that he uses, and thereby 'owns,' a mark, 2) that the defendant is using that same or a similar mark, and 3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff." Id. at 605. The harm caused by the confusion may be attributable the defendant's appropriation of the plaintiff's goodwill (perhaps leading to sales diversion), or the reduction in the value of the mark by virtue of the association of the plaintiff with the defendant's own "bad" name (so-called "reverse confusion"). See id. at 608.
 
 
 15
 AASTAR contends that STAR has failed to prove "likelihood of confusion," an essential element of a trademark infringement claim under both Massachusetts and federal law. See Astra Pharmaceutical Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1205 (1st Cir.1983); Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 486-87 (1st Cir.1981). We require evidence of a "substantial" likelihood of confusion--not a mere possibility--and typically refer to eight factors in making the assessment:
 
 
 16
 (1) the similarity of the marks; (2) the similarity of the goods [or services]; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; (8) the strength of the plaintiff's mark.
 
 
 17
 Astra, 718 F.2d at 1205. None of these factors is necessarily controlling, but all of them must be considered. Id.; Pignons S.A., 657 F.2d at 487-92. AASTAR attacks the evidence as to each factor.
 
 1. Similarity of the marks
 
 18
 A jury plainly could infer from the evidence that the designations "STAR MORTGAGE" and "AASTAR MORTGAGE" (including the star symbols) were sufficiently similar such that prospective purchasers might be confused about the source of the services desired. While AASTAR emphasizes the dissimilarity of some individual features of the designations, a jury could supportably find that the total effect of the two--including similarity in pronunciation--was to create a probability of confusion.
 
 2. Similarity of the services
 
 19
 AASTAR admits that both companies offered the same services. Thus, this factor indisputably indicates a likelihood of confusion.
 
 
 20
 3., 4., 5. Relationship between the parties' advertising, the parties' channels of trade, and the classes of prospective purchasers.[3]
 
 
 21
 The parties both advertised in The Suburban, thus providing evidence of overlap in their advertising strategies and targets. AASTAR attempts to minimize this evidence by pointing to the undisputed evidence that it advertised in many publications in which STAR did not; it asserts that thus, the parties "did not compete" in those particular advertising channels. This argument, however, is premised upon the unsupportable assumption that because some of the advertising channels differed, distinct classes of consumers were reached and the relevant consuming public would view mortgage-originating advertisements in only one source, and hence, would not be confused.
 
 
 22
 The evidence, however, supports a finding that STAR and AASTAR targeted the same classes of prospective purchasers in the same geographical areas, regardless of the particular advertising channels employed. This evidence, combined with the fact that both companies advertised in the same publication, would allow a jury to view these three factors (channels of advertising, trade, and classes of purchasers) in STAR's favor.
 
 
 23
 AASTAR additionally argues that the trial evidence established that mortgage-shoppers are highly sophisticated and exercise great care in choosing a mortgage (often a one-time purchase) and thus, the likelihood of confusion is minimal. While this argument is not without force, a jury could find that this evidence did not overwhelm the bulk of other evidence suggestive of confusion.
 
 6. Actual Confusion
 
 24
 AASTAR concedes that STAR presented evidence that the companies' names actually confused consumers about the source of the services sought. AASTAR challenges the weight of this evidence, however, arguing that it was presented by "biased" STAR employees. AASTAR also complains that most of the purportedly confused customers were not identified. These arguments, however, properly belong before the fact finder; our review of the record reveals that a jury reasonably could have credited the testimony regarding actual confusion in favor of STAR.[4]
 
 7. Intent
 
 25
 AASTAR makes much of the fact that there was no evidence that it adopted its business name in "bad faith," i.e., with the intent to take advantage of STAR's goodwill and promotion efforts. Evidence of bad intent, however, while potentially probative of likelihood of confusion, is simply not required in a trademark infringement case; moreover, "a finding of good faith is no answer if likelihood of confusion is otherwise established." President and Trustees of Colby College v. Colby College-New Hampshire, 508 F.2d 804, 811-12 (1st Cir.1975).
 
 8. Strength of the Mark
 
 26
 AASTAR contends that there was little evidence regarding the strength of STAR's service mark and that the evidence that was presented showed that the mark was weak. In assessing a mark's strength, the trier of fact considers evidence of the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark. Equine Technologies, Inc. v. Equitechnology, Inc., 68 F.3d 542, 547 (1st Cir.1995). The relevant evidence presented here was that STAR's mark was in use in the relevant market area for over two years at the time of trial, and that STAR expended several thousand dollars per month in advertising.
 
 
 27
 Even assuming that this evidence constitutes small support for this factor (and, in fact, STAR admitted at oral argument before this court that the mark was not very strong), "the strength of the mark is but one of eight factors to be considered in analyzing the likelihood of confusion issue" and sufficient evidence of other factors will sustain a finding of likelihood of confusion. Id. at 546.
 
 
 28
 In conclusion, we cannot say that a reasonable jury could not have reached a verdict for STAR based upon a consideration of all of the factors. A jury could supportably find that the marks and services were very similar, the targeted consumers were the same, and there was actual confusion as to the source of the mortgage services. A jury also could have given little relative weight to the less-supported factors of intent and strength of the mark. While the evidence supporting a substantial likelihood of confusion may not have been overwhelming, it was adequate; the court did not err in denying the motion for judgment as a matter of law, and we will not disturb the jury's verdict.
 
 II.
 Denial of Trial Continuance
 
 29
 AASTAR contends that the court abused its discretion in refusing to grant its motion to continue the trial. On the first day of trial, AASTAR filed a motion entitled "DEFENDANT'S MOTION TO CONTINUE TRIAL OR, IN THE ALTERNATIVE, MOTION IN LIMINE." In that motion, AASTAR urged that a continuance was warranted because STAR failed to produce a witness for deposition despite the court's order to do so, and because STAR was effectively "stonewalling" discovery.
 
 
 30
 AASTAR's continuance motion also requested the alternative relief of preclusion of testimony by certain witnesses and preclusion of testimony by Austin relating to certain previously unproduced documents. The record shows that the court granted the "alternative relief"--the motion in limine--and that indeed, the witnesses in question did not testify.
 
 
 31
 AASTAR now complains that Austin was "allowed to testify unrestricted" and attempts to assign error to the court's refusal to grant the continuance. We are unpersuaded for two reasons. First, having received the alternative relief it requested, AASTAR cannot now complain that the court did not grant the continuance. Second, while Austin was allowed to testify about various documents that may have fallen within the in limine order, the record reveals no objection by AASTAR on this basis during Austin's testimony. On the contrary, in response to the trial judge's careful inquiries, AASTAR indicated that it had no objection to most of the documents introduced through Austin.[5]
 
 
 32
 In sum, we find AASTAR's contention that the court erred in denying its request for a trial continuance to be without merit.
 
 III.
 The Civil Contempt Finding
 
 33
 After the jury returned its verdict on November 30, 1995, the district court issued a permanent injunction, reflected in the following exchange:
 
 
 34
 THE COURT: In view of the jury's verdict, the defendant Aastar Mortgage Corporation, its agents, servants, employees, and all other persons acting in concert therewith, are hereby permanently enjoined from continuing to do business under the name and style of Aastar Mortgage Corporation with two A's before the style, Aastar Mortgage Corporation with one A before the style, and they shall not in the future ... for so long as the plaintiff Star Financial Services shall possess the trademark Star Mortgage, either federal or state, use the letters S-T-A-R in their name in any combination with any other word. Further, they shall in no form or fashion use a logo or depiction of a five pointed star in relation to any of those words. Fourth, they shall in no fashion refer to themselves as formerly Aastar Mortgage in either of its capacities....
 
 
 35
 [I]n addition, Aastar Mortgage shall take all reasonable efforts to recall, terminate advertisements with the infringing marks and logos....
 
 
 36
 MR. MURRAY [Counsel for AASTAR]: Your Honor, may I be heard on one other thing?
 
 
 37
 ....
 
 
 38
 There are presently several loans and consumers about to close within the next week where the paperwork has been submitted on HUD forms and things like that. In light of the fact that there's no damage that's been found that relates to the plaintiffs in this case relative to the use of that name, the defendants, in order to provide no harm to the consumer, would like to be able to close those loans with the understanding that there would be no publication and no advertising relative to--
 
 
 39
 THE COURT: Any forms that are out of Aastar's office, either now before HUD or any lending institution, they are not in my requirement of use of best efforts, they do not have to recall any consumer forms. No more forms go out with the word Aastar starting now. Tomorrow morning no form, no paper goes out of that office using Aastar, single or double A's, using the star or using the word S T A R.
 
 
 40
 That's the order of the Court.
 
 
 41
 About one week after the injunction issued, employees at AASTAR sent name-change facsimiles to several mortgage lenders. These notices displayed the "AASTAR" logo (containing a star symbol in the third "A") in large, bold letters at the top of the page, and thereafter stated, "WE'VE CHANGED OUR NAME; WE ARE NOW KNOWN AS: AACTION MORTGAGE CORP.; PLEASE CORRECT YOUR RECORDS." STAR's counsel immediately notified AASTAR's counsel about the notices, and AASTAR ceased using them. Over one month later, after it had moved and argued for attorneys' fees from the underlying action, STAR filed a motion for civil contempt stemming from the use of the facsimiles. The court then held an evidentiary hearing on that motion.
 
 
 42
 At the hearing, employees of AASTAR (now AACTION) admitted to transmitting the facsimiles, but professed a belief that such notices were in compliance with the court's order, as modified. Specifically, they stated that the notices were sent only to lenders with loans in progress, and explained that "their interpretation" of the injunction was that the court only ordered them to "do the best that they could" with respect to pending loans. One witness indicated that he thought he could "go a little further" than the court's injunction by informing lenders (that, he said, were processing loans that were "out of AASTAR's control") of the name change with the facsimiles. When queried by the court, however, all of the witnesses acknowledged that they understood the court's order--specifically, "no paper goes out of that office using Aastar"--and that the notices fell within that language.
 
 
 43
 In explaining its ruling on the motion, the court acknowledged AASTAR's substantial efforts to comply with the injunction, but stated that the wording of the order was clear and unambiguous and that if there were any doubts, clarification or modification from the court should have been sought. The court found that AASTAR, "in an effort to preserve the goodwill to which [it] had no right," deliberately disobeyed the order. Having found a "clear and undoubted disobedience," the court held AASTAR in civil contempt, and ordered it to pay attorneys' fees to STAR (in the amount of $750) as well as costs associated with bringing the contempt proceeding.
 
 
 44
 On appeal, AASTAR contends that the civil contempt finding was "unfair" because the injunction was overly broad, ambiguous, and impossible to comply with. We disagree. As a preliminary matter, we note that nothing in the record indicates that AASTAR objected to the breadth of the injunction, or complained of impossibility of compliance either before, during or after the contempt proceeding. AASTAR raises these issues for the first time on appeal in its effort to avoid the contempt citation, and it does not argue that it continues to suffer from the purported overbreadth. Thus, we will discuss the issues of the breadth and ability to comply only insofar as they relate to the civil contempt adjudication.
 
 
 45
 Next, we agree with the district court that the injunctive order was not ambiguous. See 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2960 (1995) (explaining that, in civil-contempt proceeding, the court must find that the order was clear and unambiguous). The court ordered AASTAR to cease all use of the trade name "AASTAR" or its star logo, to refrain from referring to itself as "formerly Aastar Mortgage," and to use its best efforts to recall or cancel advertising with the infringing mark. In response to AASTAR's inquiry about pending loans and already-submitted paperwork, the court explained that any such paperwork was not within its requirement to use best efforts to recall. The court completed its injunctive order with the following unequivocal language: "No more forms go out with the word Aastar starting now. Tomorrow morning no form, no paper goes out of that office using Aastar." That directive was clear.
 
 
 46
 Based on the evidence, we conclude that the court supportably found that AASTAR deliberately and unjustifiably disobeyed the injunction. AASTAR's employees testified that they did not intend to violate the injunction, and that they transmitted the facsimiles in the belief that that conduct was in compliance with the order. Such assertions are unavailing, however, because good faith, or the absence of willfulness, does not relieve a party from civil contempt in the face of a clear order. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 499-500, 93 L.Ed. 599 (1949) (explaining that "[a]n act does not cease to be a violation of a law and of a decree merely because it may have been done innocently"); Morales-Feliciano v. Parole Bd. of P.R., 887 F.2d 1, 5 (1st Cir.1989), cert. denied, 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990).
 
 
 47
 While good faith will not excuse civil contempt, impossibility of compliance does constitute a defense. See Morales-Feliciano, 887 F.2d at 5. Here, however, even assuming the injunction was overbroad, AASTAR has not shown how its particular conduct stems from the impossibility of compliance with the order. Rather, the evidence plainly shows that AASTAR's employees voluntarily chose to transmit the offending facsimiles.
 
 
 48
 As the district court correctly admonished, if AASTAR was confused about the scope of the order or felt that it was unable to comply, it should have sought relief from the court. See McComb, 336 U.S. at 192, 69 S.Ct. at 500 (stating that "if there were extenuating circumstances or if the decree was too burdensome in operation ... [the contemnors] could have petitioned the District Court for a modification, clarification or construction of the order"). Instead of seeking help or information from either the court or its attorney, AASTAR's employees "undertook to make their own determination of what the decree meant" and thereby "acted at their peril." Id.
 
 
 49
 For the above reasons, we uphold the district court's adjudication of civil contempt.
 
 IV.
 Attorneys' Fees Award
 
 50
 The district court awarded attorneys' fees to STAR because of the jury's verdict on the Massachusetts unfair practices claim. See Mass. Gen. L. ch. 93A, § 11. AASTAR argues that the court erred by awarding attorneys' fees for two reasons: (1) the court erroneously instructed the jury that, even if it found no actual damages, it must award a minimum statutory damage of $25.00, and (2) because no damages were "actually" found, recovery of attorneys' fees is precluded. STAR contends that the court erred awarding less than the amount it requested.
 
 A. Propriety of Attorneys' Fees Award
 
 51
 STAR prevailed on its unfair practices claim under Mass. Gen. L. ch. 93A, §§ 2 and 11. Section 11 provides, in part:
 
 
 52
 If the court finds in any action commenced hereunder, that there has been a violation of [ch. 93A § 2], the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action.
 
 
 53
 Mass. Gen. L. ch. 93A, § 11 (emphasis added). Another provision in that section states:
 
 
 54
 [The complainant], if he has not suffered any loss of money or property, may obtain ... an injunction if it can be shown that the ... unfair method of competition, act or practice may have the effect of causing such loss of money or property.
 
 
 55
 Id.
 
 
 56
 The court instructed the jury that a statutory minimum of $25 must be awarded if it finds that an unfair practice has occurred under Sections 2 and 11 of Mass. Gen. L. ch. 93A.[6] Accordingly, the jury awarded $25 in damages on that claim, even though it awarded nothing on the infringement claims. AASTAR contends that because the jury's verdict indicates that STAR had not been harmed by AASTAR's conduct, attorneys' fees are precluded under state law precedent. We disagree.
 
 
 57
 We note first that because AASTAR failed to object to the "statutory damages" instruction, our review of that issue, if it were necessary for our decision, would be seriously limited. Putting aside that issue for now, we find even assuming that the jury had not awarded any damages on the unfair practices claim, attorneys' fees still would be warranted in light of the grant of injunctive relief.
 
 
 58
 Section 11 provides that a prevailing claimant is entitled to attorneys' fees "in addition to other relief provided for by this section and irrespective of the amount in controversy." Mass. Gen. L. ch. 93A, § 11. The Supreme Judicial Court of Massachusetts has interpreted that language to mean that "relief solely in the form of attorneys' fees may not be had" but rather, "a plaintiff must be entitled to relief in some other respect in order to be entitled to an award of attorneys' fees." Jet Line Services, Inc. v. American Employers Ins. Co., 404 Mass. 706, 537 N.E.2d 107, 115 (1989). Accordingly, courts have awarded attorneys' fees not only when damages were awarded, but also where, as here, the prevailing plaintiff received injunctive relief only. See Jillian's Billiard Club of Am., Inc. v. Beloff Billiards, Inc., 35 Mass.App.Ct. 372, 619 N.E.2d 635, 639 (1993), review denied, 416 Mass. 1108, 625 N.E.2d 1369 (1993); Informix, Inc. v. Rennell, No. 931265, 1993 WL 818555, at * 5 (Mass.Super.Ct., Sept. 27, 1993); see also Advanced Sys. Consultants Ltd. v. Engineering Planning and Management, Inc., 899 F.Supp. 832, 833-34 (D.Mass.1995); cf. Levy v. Bendetson, 6 Mass.App.Ct. 558, 379 N.E.2d 1121, 1126 (1978) (reversing attorneys' fees award where party received no relief under Section 11 "either by way of damages or injunction or otherwise").
 
 
 59
 In support of its position, AASTAR cites the following language from Jet Line: "A plaintiff suing under § 11, however, cannot recover attorneys' fees for merely identifying an unfair or deceptive act or practice. Under § 11, that unfair or deceptive conduct must have had some adverse effect upon the plaintiff, even if it is not quantifiable in dollars." 537 N.E.2d at 115 (emphasis added). Given the context of Jet Line, however, we find it inappropriate to interpret that language as AASTAR seeks. In Jet Line, the court remanded the attorneys' fees issue because of a question regarding liability on the underlying claim; it also appears that, while actual damages may have been questionable, the plaintiff did not request injunctive relief. See generally, id.
 
 
 60
 Moreover, the language in Jet Line is not necessarily inconsistent with an award of attorneys' fees to a plaintiff that receives injunctive relief only. Section 11 provides for injunctive relief where the unfair practice "may have the effect of causing ... loss of money or property." Mass. Gen. L. ch. 93A, § 11. Surely a demonstrated risk of future actual loss constitutes an unquantifiable "adverse effect" within the meaning of Jet Line. To hold otherwise would discourage victims of unfair trade practices from seeking legal redress until after actual loss of money or property occurred, even where the victim demonstrates a risk of such loss.
 
 B. The Amount of the Award
 
 61
 The court awarded only $18,000 of STAR's requested $35,153.25 in attorneys' fees, representing some 240 hours of work by trial counsel and his associate attorney. In ruling on the fee application, the court, citing Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 382 N.E.2d 1065, 1071 (1978), found that, while STAR's attorneys did not spend an unreasonable amount of time on the action, "it ought not be compensated at the rate that the attorneys charge." The court stated, "[i]t does seem to this Court that a rate of $175 per hour for the services ... would overcompensate [STAR] in view of the ... relative simplicity ... of the matter." The court continued, "[t]herefore, the fair value of the services to the plaintiff is, in this case, not the $35,000 ... sought by the plaintiffs, but $27,000."
 
 
 62
 The court then reduced the award by an additional $9,000 to $18,000, explaining that it had considered "factors that are implicit in the duty of attorneys to the Court" including:
 
 
 63
 the approach that the attorney took to the litigation; the care with which settlement was evaluated and discussed with the other side; the prompt and lawyer-like preparation of the case for trial, or its alternative; the faithful [sic] requirement imposed upon counsel for full and forthcoming discovery.
 
 
 64
 In light of these factors, the court observed that STAR's counsel had been deficient in two respects: first, after obtaining a very early trial date, counsel departed for a hunting trip having not delegated the authority to handle case preparation or settlement; second, on the eve of trial, counsel took it upon himself to remove a witness from his proposed witness list despite the court's order to produce that witness, and then failed, during trial, to be "faithfully forthcoming with respect to appropriate discovery of the witness," also despite a clear court order. The court also opined that even though the conduct of STAR's counsel was not "unethical," it was "less than what the Court is entitled to obtain from the attorneys who practice at its bar." The court concluded that counsel's deficiencies "stunted the time necessary for discussion of settlement" and found "very questionable" counsel's unavailability to discuss settlement at all times prior to trial, given that the dispute was essentially over damages.
 
 
 65
 Massachusetts law controls the attorneys' fees question here. Peckham v. Continental Casualty Ins., 895 F.2d 830, 841 (1st Cir.1990). Our review is plenary to the extent STAR argues that the court's reasons for the fee reduction were erroneous as a matter of law. See Lipsett v. Blanco, 975 F.2d 934, 942 (1st Cir.1992). To the extent STAR challenges the court's determination that the case fits factually within a legally acceptable reduction theory, we review for abuse of discretion. See id. at 942 n. 7; see also id. at 937 ("[B]ecause determination of the extent of a reasonable fee necessarily involves a series of judgment calls, an appellate court is far more likely to defer to the trial court in reviewing fee computations than in many other situations.").
 
 
 66
 While there is no "pat formula" for computing a fee award under Massachusetts law, Peckham, 895 F.2d at 830, the amount awarded should be determined by what the "services were objectively worth," Heller, 382 N.E.2d at 1071. In making this calculation, the court may consider a variety of factors, including: the amount of time expended, the complexity of the legal and factual issues, the quality of the attorneys' services, the amount of damages and the results secured. Peckham, 895 F.2d at 841; Linthicum v. Archambault, 379 Mass. 381, 398 N.E.2d 482, 488 (1979). No single factor is necessarily dispositive of the services' worth. See Cummings v. National Shawmut Bank, 284 Mass. 563, 188 N.E. 489, 492 (1934). In the end, the court's calculation is "largely discretionary," Linthicum, 398 N.E.2d at 488, and an appellate court should "defer to any thoughtful rationale and decision developed by a trial court and ... avoid extensive second guessing." Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950 (1st Cir.1984).
 
 
 67
 STAR first attacks the court's initial reduction from the requested $35,153.25 to $27,000. STAR contends that this reduction resulted from "mathematical error" because the court erroneously assumed that counsel charged $175/hr. for all of his work, when in fact, most of it was charged at $150/hr. (while the associate attorney's work was charged at the rate of $125/hr.). STAR asserts that because only 10.75 hours were charged at $175/hr., the court should have deducted only about $260 (representing the approximate difference between 10.75 billed at $175/hr. and at $150/hr.), rather than the $8,153.25 that it did.
 
 
 68
 Upon careful review of the record, we are unpersuaded by STAR's assertion of "mathematical error." STAR's position assumes that the court, when declining to award at the $175/hr. rate for trial counsel, necessarily intended instead to award for his work at the $150/hr. rate. We find, however, that the numbers simply do not support this underlying assumption.[7]
 
 
 69
 Moreover, when STAR clearly laid out this precise argument to the district court in the form of a motion to amend or make additional findings under Fed.R.Civ.P. 52(b), the court considered and denied the motion, stating: "The findings are fully adequate under both state and federal law." A fair conclusion from the record is that although the court found that counsel had in fact expended the claimed amount of time on the case, the simplicity of the case rendered the fees excessive and warranted a reduction for over-lawyering. Thus, we affirm the court's initial reduction from $35,000 to $27,000.
 
 
 70
 STAR also contends that the court erred in its additional fees reduction, from $27,000 to $18,000. STAR argues that the articulated reasons for that reduction are insupportable as a matter of law and on the facts of this case. In particular, STAR asserts that when its counsel informed the court of his planned hunting trip, the court stated that it would "respect" those plans. STAR contends that it was error to then "punish" counsel for taking his vacation and being unavailable to handle any developments in the case.[8] STAR argues that no reduction should result from its deletion of a witness because it ultimately produced the witness (albeit on the last day of trial) and because the court opined that the witness would not have given testimony favorable to AASTAR in any event. STAR argues finally that "stunting the time necessary for discussion of settlement" is an impermissible factor to be considered in an attorneys' fees award.
 
 
 71
 The district court reduced the attorneys' fees award from $27,000 to $18,000 because it found that STAR's counsel had not fulfilled his obligations in trial preparation, negotiation and discovery. These considerations, including "the stunting of time necessary for discussion of settlement," plainly reflect upon the "quality of work performed," one of the factors to be considered in calculating the fee award. See Heller, 382 N.E.2d at 1071. We have no difficulty finding that an attorney's competence extends to her compliance with obligations to the court, which may ultimately affect the value of services to her client. Thus, the court did not err in citing these reasons in determining the "objective worth" of counsel's services.
 
 
 72
 We also uphold the district court's determination that the facts of this case merit the reduction.[9] As to STAR's assertion that the court first "respected" counsel's vacation plans but then "punished" him for it, we note that the court respected counsel's plans only insofar as they affected the trial date; in no manner did the court indicate that counsel was otherwise excused from his trial obligations while he was on the hunt. With regard to counsel's failure to produce a witness, in defiance of the court's order, we think that whether or not the witness ultimately would have helped AASTAR is irrelevant to counsel's initial discovery obligation. Finally, we reject STAR's assertion that the court penalized counsel for not settling the case; rather, the court found that counsel's deficiencies in performance hindered the opportunity for settlement, thus negatively reflecting upon his services. We cannot say that the court abused its broad discretion in making these determinations.
 
 
 73
 Therefore, we affirm the district court's attorneys' fees award in all respects.[10]
 
 V.
 Conclusion
 
 74
 For the foregoing reasons, we affirm the fee award and judgment of the district court.
 
 
 
 [1]
 Although the parties and the district court referred to this case as a "trademark" infringement case, it is really a dispute over a "service mark." The difference between the two, however, is not relevant to our discussion, see Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 23 n. 1 (1st Cir.1989), and we will refer to the case as one of "service mark infringement" while considering both trademark and service mark cases in our discussion. See id
 
 
 [2]
 For the first time on appeal, AASTAR requests a new trial. Because it did not timely request this relief below as Fed.R.Civ.P. 59(b) requires, AASTAR may not now obtain this relief
 
 
 [3]
 We often analyze these three factors together, and we find it appropriate to do so here. Equine Technologies, Inc. v. Equitechnology, Inc., 68 F.3d 542, 546 n. 5 (1st Cir.1995)
 
 
 [4]
 AASTAR also resurrects its frustrations about difficulties it experienced in discovery of witnesses and documents needed by it to attack the weight of the testimony about confusion. While we agree with the district court that STAR was less than forthcoming in meeting its discovery obligations, the court adequately addressed the problem by precluding STAR from presenting certain witnesses and by providing an adverse inference instruction about one customer. In the end, AASTAR's discovery arguments are irrelevant to the weight a jury could give the evidence before it (on proper instructions)
 
 
 [5]
 As to the documents that AASTAR did object to (but not on the grounds of the in limine order), one was precluded on hearsay grounds, and another was admitted with an adequate limiting instruction
 
 
 [6]
 There does not, in fact, appear to be a minimum statutory damages provision in the statutes at issue in this case. Cf. Mass. Gen. L. ch. 93A § 9(a) (providing, in some cases, for minimum damages award of $25)
 
 
 [7]
 STAR's request for some $35,000 in fees, which the court found excessive, reflected about 164 hours of work by trial counsel (some hours at the $150/hr. rate, others at the $175/hr. rate), and about 82 hours of work by associate counsel (at a $125/hr. rate), for a total of approximately 246 hours. Simple division of the awarded amount ($27,000) by the hours expended (246) reveals that the court did not find even a $150/hr. rate reasonable for this case, not to mention the $175/hr. rate. Thus, STAR's argument that the court erroneously based its award on its belief that the higher rate was excessive does not support its implied conclusion that the court must have found the $150/hr. rate to be reasonable. Rather, it appears that the court found both rates excessive, and adjusted the amount accordingly. STAR has not argued that the court erred in its apparent finding that even the $150/hr. rate was excessive or that the court otherwise erred in calculating the lodestar
 
 
 [8]
 We find most unpersuasive STAR's additional assertion that, had counsel not taken his planned vacation, he would have "necessarily" spent more time preparing the case which, in turn, would have resulted in additional attorneys' fees
 
 
 [9]
 While STAR argues that the reasons for the fee reduction were erroneous, it does not argue that the degree of the reduction was unreasonable
 
 
 [10]
 The court ordered AASTAR to pay costs "in the amount prayed for," which was $2,588.24, and AASTAR has not opposed the amount of that request. Thus, we will not disturb the costs award to STAR in the amount of $2,588.24