Cordatos v. Skerry                          CV-95-214-M    09/26/96

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Peter Cordatos and
Jennie Cordatos,
      Plaintiffs,

v.                                          Civil No. 95-214-M

David Skerry,
Bennington Police Department, and
Town of Bennington,
      Defendants.


O R D E R


     Peter and Jennie Cordatos bring this action pursuant to 42 U.S.C. § 1983, to redress alleged violations of their Fourth and Fifth Amendments rights.  They also seek compensation from defendants for alleged violations of the New Hampshire Constitution, The New Hampshire Child Protection Act (N.H. Rev. Stat. Ann. ("RSA") ch. 169-C), and New Hampshire common law.  Presently before the court is defendants' motion for summary judgment.


**Standard of Review**

     Summary judgment is proper "if pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact "is one `that might affect the outcome of the suit under the governing law.'" United States v. One Parcel of Real Property with Bldgs., 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. Anderson, 477 U.S. at 256. The party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial, demonstrating "some factual disagreement sufficient to deflect brevis disposition." Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992). That burden is discharged only if the cited disagreement relates to a genuine issue of material fact. Wynne v. Tufts University School of Medicine, 976 F.2d 791, 794 (1st Cir. 1992), cert. denied, 507 U.S. 1030 (1993).

## Facts

In March of 1992, Dianne McClintock, the nurse at ConVal High School, received an anonymous telephone call from a woman expressing concern for Julie Cordatos, plaintiffs' 16 year-old

daughter and a student at ConVal. Upon learning of that report, Ronald Crowe, a guidance counsellor at ConVal High School, spoke with Julie and suggested that she consider receiving counseling. Julie agreed and met with Crowe and Connie Lester, another employee of ConVal High School.

On Saturday, March 28, 1992, Lester contacted Crowe and said that she was concerned for Julie's safety. She explained that Julie was depressed and recently attempted to cut her wrists; Julie had twice tried to kill herself, first on February 14 and again on March 26. Lester told Crowe that it was imperative that someone intervene on Julie's behalf. Crowe immediately contacted Bennington Police Officer David Skerry and explained the situation. Skerry said that he would go to Julie's house to investigate.

When Officer Skerry arrived at the Cordatos' home, he spoke with plaintiff, Peter Cordatos. Skerry explained that representatives of ConVal High School had contacted him and expressed concern about Julie. Skerry explained that Julie had tried to hurt herself on two occasions by cutting her wrists. Julie admitted to her father that she had cut her wrists and

3

showed him and Skerry the scars.  Officer Skerry then asked if he could speak with Julie privately outside.  Mr. Cordatos agreed.

Julie and Officer Skerry spoke in his police cruiser.  Julie said that she was afraid and did not want to go back into the house.  She explained that when she was younger, a man (her step-grandfather, Ted Holbrook) had sexually abused her.  She told Skerry that her parents were again permitting Holbrook to visit their home and she was concerned that he might abuse her again.  Julie also explained that one of her parents' friends, Larry Ogden, had been making sexual advances toward her and her parents had done nothing to stop it.  Apparently, Ogden had been indicted for sexual abuse of a child and plaintiffs provided his bail and were permitting him to reside with their family while he awaited trial.

Skerry went back to tell Mr. Cordatos that he wanted to take Julie to the police station to speak with her.  Again, Cordatos agreed.

When Skerry and Julie arrived at the police station, Skerry contacted the Help Line, an after-hours emergency placement

4

service available to law enforcement officers when representatives from the New Hampshire Division for Youth, Children and Families ("DCYF") are unavailable. Skerry asked if Julie could be put into an emergency placement. He learned, however, that the two homes providing such services in the area were full. Skerry then spoke with Ms. Lester, who suggested that Julie might stay with her friend and employer, Milicent Ho. Julie also asked Skerry if she might stay with Ms. Ho. Accordingly, Skerry made arrangements with Ms. Ho, drove Julie to her home, and returned to explain the situation to plaintiffs. He stated that Julie had been temporarily placed until Monday, March 30th, at which time DCYF could provide assistance. He told plaintiffs that he would do his best to keep them informed of the situation.

Two days later, on Monday, March 30, 1992, Help Line staff member Kim Hemeon contacted DCYF to report Officer Skerry's contact with Help Line over the weekend. The Bennington Police Department also reported Julie's case to DCYF. DCYF then prepared an Intake Report. Based upon information provided by Officer Skerry, including the fact that Julie had already been removed from plaintiffs' home, DCYF assessed Julie's situation as

5

presenting a "mild" risk.  After reviewing the Intake Report, Cheryl Myers, a DCYF Supervisor, assigned Child Protective Service Worker Betsy Wilder to Julie's case.

Later that day, Ms. Ho brought Julie to meet with Ms. Wilder.  As before, plaintiffs were informed of how defendants and DCYF planned to proceed.  And, once again, they agreed to the proposed plan.  Specifically, Ms. Cordatos gave written permission for Julie to participate in an emergency psychological evaluation by Monadnock Family Services.  See Letter of Jennie Cordatos dated March 30, 1992.  Betsy Wilder immediately arranged the emergency evaluation.  Nancy Rappaport of Monadnock Family Services reported that Julie appeared to be suffering from post traumatic stress disorder.  She told Ms. Wilder that, in her professional opinion, if Julie were returned to her home, it was very likely that she would again attempt suicide.  Affidavit of Betsy Wilder, at paras. 1-4.

On Tuesday, March 31, 1992, Ms. Wilder met with Julie and her half-sister, Sheri Paquette (who no longer lived with plaintiffs), at the Bennington police station.  Both girls stated that when they were younger they had been sexually abused by

6

Sheri's grandfather, Ted Holbrook.  They also said that Holbrook had recently begun visiting their home again.  The girls also spoke of Ogden's presence at plaintiffs' home and Julie said that he had been making sexual advances toward her.  Julie told Ms. Wilder that she could not deal with the situation and asked that she not be forced to return home.

After her meeting with the girls, Ms. Wilder contacted Hillsborough District Court Judge Hatfield and explained her concern.  Judge Hatfield said that he would accept an ex parte petition (presumably under RSA 169-C) if Julie's parents refused to permit Julie's placement with a neutral party until Monadnock Family Services could complete its evaluation of Julie.  See RSA 169-C:6, V.

Ms. Wilder then met with plaintiffs and attempted to explain the results of Julie's initial evaluation.  Wilder reported that plaintiffs "made statements that led [her] to believe that they [did] not believe that Julie [had] a problem."  Wilder affidavit, at para. 8.  Ms. Wilder then explained her conversation with Judge Hatfield and suggested that Julie be temporarily placed with a neutral party.  Again, plaintiffs agreed and permitted

7

Julie to be temporarily placed with her maternal grandmother. Because plaintiffs agreed to Julie's temporary placement outside of their home, neither DCYF nor the defendants sought a protective custody hearing pursuant to RSA 169-C:6.

On April 23, 1992, DCYF filed a Petition for Abuse or Neglect on Julie's behalf. See RSA 169-C:7. Plaintiffs were notified of, and participated in proceedings in the Hillsborough District Court and Henniker District Court. District Court Judge Ellen Arnold ultimately held that Julie was a neglected child. Additionally, Judge Arnold decreed that Julie live with Milicent Ho and her husband, who had obtained a temporary foster care license and were taking the necessary steps to obtain a permanent license.

On December 10, 1992, plaintiffs appealed Judge Arnold's neglect finding to the Merrimack County Superior Court. However, about two months earlier, Julie turned 18. And, after speaking with representatives of DCYF, Julie decided that she did not want to pursue the matter any further, primarily because she no longer lived with her parents and did not want to have to testify again about the abuse she had suffered. In response to Julie's

8

request, DCYF withdrew the Abuse or Neglect Petition which it had filed on her behalf.

Julie presently lives with Mr. and Mrs. Ho. She has assumed the Ho's last name and severed all ties with her family.

## Discussion

Although plaintiffs generally invoke the Fourth and Fifth Amendments to the Constitution, the precise nature of their claims is far from clear. What is clear is that they believe that Officer Skerry's "warrantless seizure" of Julie from their home violated their constitutionally protected right to "family integrity."

In light of the uncontested facts of record, plaintiffs' complaint lacks merit. First, and perhaps most fundamentally, the undisputed facts do not support plaintiffs assertion that an unlawful "seizure" occurred. At each step of the process, beginning with Officer Skerry's initial interview of Julie, plaintiffs were consulted and consented to the proposed conduct. To the extent that this matter is properly addressed in Fourth Amendment terms, it is unclear how a consensual "seizure" of the

9

sort alleged could be deemed "unreasonable" within the meaning of the Fourth Amendment.

Moreover, plaintiffs' standing to assert a Fourth Amendment violation stemming from the alleged "seizure" of their 16 year-old daughter is doubtful. Importantly, plaintiffs alone bring this action; Julie is not a plaintiff and, to the extent that any of her rights may have been violated by her "seizure," plaintiffs have not shown how, or why they should have standing to assert her claims.

Nevertheless, even if the court assumes that plaintiffs have standing, and even if it assumes a Fourth Amendment violation for the purposes of this discussion, plaintiffs still would not be entitled to recover under 42 U.S.C. § 1983.

I.  Qualified Immunity

Liberally construed in plaintiffs' favor, the complaint alleges that Officer Skerry "seized" Julie from their home without probable cause and, in the process violated their constitutionally protected right to "family integrity."  Based

10

upon the undisputed facts of record, however, Officer Skerry is entitled to qualified immunity from suit and from liability.

Public officials performing discretionary functions are entitled to qualified immunity from suit for violations of federal law "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The qualified immunity analysis in this circuit has two components: (1) "whether the constitutional right asserted by the plaintiff was `clearly established' at the time of the alleged violation," and (2) "whether `a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right.'"  St. Hilaire v. City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995) (quoting Burns v. Loranger, 907 F.2d 233, 236 (1st Cir. 1990)), cert. denied, 116 S. Ct. 2548 (1996).  To be clearly established, the right asserted must be articulated at an appropriate level of particularity so that "`[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right,'" although the same action need not previously have been ruled

11

unconstitutional.  St. Hilaire, 71 F.3d at 24-25 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "The ultimate question of whether a defendant is entitled, on a given set of facts, to the protection of qualified immunity is a question of law for the court to decide."  Wood v. Clemons, 89 F.3d 922, 927 (1st Cir. 1996).

Turning to the first element of the qualified immunity analysis, it is apparent that the contours of plaintiffs' right to family integrity were insufficiently defined to put Skerry on notice that, by taking Julie under the facts presented in this case, he was likely violating that right.  To be sure, the Supreme Court has recognized an amorphous constitutionally protected right to "family integrity."  See, e.g., Stanley v. Illinois, 405 U.S. 645 (1972).  Plainly, however, that right is not absolute.  Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993).  In fact, as plaintiffs themselves concede, the New Hampshire Supreme Court has held that:

> [T]he parental interest in raising children without State intervention is not without limitation.  Rather, the parental right of family autonomy is subject to a corresponding duty on the part of parents to adequately care for their children, and child-rearing rights are secured by the law only to the extent that parents discharge their obligation.  The State has a competing

12

> interest in the welfare of children within its jurisdiction, and may, as parens patriae, intervene in the family milieu if a child's welfare is at stake. Accordingly, parental rights are not absolute, but are subordinate to the State's parens patriae power, and must yield to the welfare of the child.

Preston v. Mercieri, 133 N.H. 36, 40 (1990) (citations omitted). See also, Stanley v. Illinois, 405 U.S. at 652 ("We do not question the assertion that neglectful parents may be separated from their children.").

So, whatever the precise contours of the right to family integrity may have been when Julie was removed from the plaintiffs' home, it is clear that no parent enjoys a clearly established constitutional right to be free from child abuse or neglect investigations, or to maintain control over a child within the family unit when the child's own welfare requires removal. The foregoing is particularly true when, as here: (1) an objectively reasonable police officer possessing the same information Skerry had could have concluded that there was probable cause to believe that a child was being neglected and/or abused (as defined by state law); and (2) that an objectively reasonable police officer could have believed that, by failing to

13

intervene, the child would be exposed to a substantial risk of harm (or in this case, possibly death by suicide).

Here, Skerry was acting under the provisions of RSA 169-C, which provides, in pertinent part, that:

> A police or juvenile services officer may take a child into protective custody without the consent of the parents or other person legally responsible for the child's care if the child is in such circumstances or surroundings as would present an imminent danger to the child's health or life unless immediate action is taken and there is not enough time to petition for a court order.

RSA 169-C:6, I. The statute defines "imminent danger" as "circumstances or surroundings causing immediate peril or risk to a child's health or life." RSA 169-C:3, XV. Even if plaintiffs had not consented to Skerry's removal of Julie, any reasonable police officer could (and in fact probably should) have concluded that intervention was not only justified but mandated. Stated somewhat differently, an objectively reasonable police officer in Skerry's position could certainly conclude that, under RSA 169-C, probable cause existed to remove Julie from Plaintiffs' home, even absent parental consent, as was given here.

14

The court need not recount in detail the reliable information upon which Skerry could justifiably have based his decision to intervene. It is sufficient to point out that even before completing his investigation or receiving Julie's psychological report, he knew that: (1) ConVal had received an anonymous call from someone who stated that Julie was in danger; (2) a ConVal employee familiar with Julie's situation reported that Julie was in immediate danger and recommended that someone intervene as soon as possible; (3) Julie admitted to Skerry (and her father) that she had tried, quite recently, to kill herself on two occasions; (4) Julie told Skerry about the sexual abuse which she had experienced in the past and said that two adult males in her household (one of whom had abused her in the past) were making sexual advances toward her; and (5) Julie explained that she was afraid to return to her parents' home.

Plaintiffs claim that absent more substantial physical evidence of Julie's suicide attempts, Skerry lacked probable cause to believe she was in "imminent danger." That assertion is frivolous. Skerry might well have been derelict in his duties (or, at a minimum, morally blameworthy) had he <u>not</u> assisted Julie in her efforts to escape from plaintiffs' home. No reasonable

15

person could possibly conclude that, based upon the information available to him at the time, Skerry acted without probable cause or in any way violated plaintiffs' clearly established constitutional rights. Accordingly, Officer Skerry is entitled to qualified immunity.

II. Municipal and "Official Capacity" Liability

A municipality cannot be held vicariously liable under § 1983 for the wrongful acts of its employees. Collins v. City of Harker Heights, 503 U.S. 115, 121 (1992). A municipality may be liable, however, when one of its employees acts pursuant to a municipal custom or policy and, in so doing, violates someone's constitutional rights. Id. Municipal liability attaches under § 1983 only when the "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by the body's officers." Monell v. New York City Department of Social Services, 436 U.S. 658, 690 (1978). So, in order to prevail on their § 1983 claim against the Bennington Police Department and the Town of Bennington, plaintiffs must show a direct causal connection between municipal conduct and a constitutional deprivation. See, e.g., Oklahoma City v. Tuttle,

16

471 U.S. 808, 824-25 n.8 (1985) (requiring an "affirmative link" between the municipal policy and the alleged constitutional deprivation.).

To avoid summary judgment, however, plaintiffs must support their claims with something more than mere subjective characterizations or unsubstantiated conclusions. Plaintiffs have failed to carry that burden. In the absence of some indication of municipal direction via a policy, practice, or custom, and given that a respondeat superior cause of action is not cognizable under § 1983, the police department and the Town are entitled to summary judgment.

Moreover, Officer Skerry is not liable in his official capacity for any alleged constitutional deprivations. Because "official capacity suits generally represent only another way of pleading an action against an entity for which an officer is an agent," Brandon v. Holt, 469 U.S. 464, 472 n.21 (1985), and because plaintiffs have failed to show that their alleged injuries are the product of any municipal custom or policy,

17

Officer Skerry is entitled to summary judgment in his official capacity.[1]


III. Plaintiffs' State Law Claims

Having held that Officer Skerry is entitled to qualified immunity and that plaintiffs have failed to state a viable claim against the remaining defendants, the court declines to exercise its supplemental jurisdiction over plaintiffs' state constitutional, statutory, and common law claims.


**Conclusion**

For the foregoing reasons, defendants are entitled to summary judgment with regard to all of plaintiffs' federal claims. And, because the court declines to exercise its supplemental jurisdiction over plaintiffs' state law claims, they are dismissed without prejudice. Defendants' motion for summary judgment (document no. 11) is granted. The Clerk of the Court is instructed to enter judgment in favor of defendants in accordance with this order and close the case.

---

[1] Plaintiffs do not allege that Officer Skerry possessed policy-making authority, nor do they claim that he acted as a municipal policy-maker when he removed Julie from their home. See generally, Penney v. Town of Middleton, 888 F.Supp. 332, 340-41 (D.N.H. 1994).

18

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

September 26, 1996

cc:   Stephen F. Queeney, Esq.
      Michael Lenehan, Esq.