**DORAL PHARMAMEDICS, INC., Plaintiff,**

v.

**PHARMACEUTICAL GENERIC DEVELOPERS, INC., Defendant.**

**No. CIV 00–2342 DRD.**

United States District Court, D. Puerto Rico.

June 19, 2001.

Rafael Escalera–Rodriguez, Jorge A. Rullan–Marin, Reichard & Escalera, San Juan, PR, Michael H. Selter, Farkas & Manelli, Washington, DC, for plaintiff.

Manuel Fernandez–Bared, Toro Colon Mullet & Rivera, San Juan, PR, Armando Llorens, Dora M. Penagaricano–Suarez, McConnell Valdes, San Juan, PR, for defendant.

### *OPINION AND ORDER*

DOMINGUEZ, District Judge.

Pending before the Court is a request for preliminary injunction sought by Plaintiff, Doral Pharmamedics, Inc., ("Doral"), owner of the ExoticHC trademark (hereinafter referred to as "Exotic"), seeking to restrain Defendant, Pharmaceutical Generic Developers, Inc., ("PGD") from using the Genexotic–HC (hereinafter referred to as "Genexotic"), mark or any other mark or trade dress that in any way may cause confusion, mistake or deception as to the trademark "Exotic".

Defendant PGD has averred that this Court should deny Doral's request for in-

junctive relief because there is no likelihood of confusion between the Doral and PGD products. That is, that there is no confusion between Exotic and Genexotic trademarks. Defendant has also argued that Doral's complaint, which serves as the basis for the injunctive relief request under the Court's consideration, should be barred on judicial estoppel grounds. For the reasons set forth in this opinion, Plaintiff's request for preliminary injunction is **DENIED.**

## I. Procedural Background

On October 18, 2000, Plaintiff Doral filed a verified complaint (Docket No. 1) alleging that (1) PGD had infringed on Doral's Exotic–HC ("Exotic") trademark rights under Section 32(1) of the Lanham Act, 15 U.S.C. Sec. 1114(1); and, (2) PGD's deliberate use of the Genexotic–HC ("Genexotic") mark and confusingly similar trade dress in the distribution, marketing and sale of Genexotic constituted unfair competition and false designation of origin actionable under Section 43 of the Lanham Act, 15 U.S.C. Sec. 1125(a).

Defendant did not present an answer to Doral's complaint and instead noticed Plaintiff with a motion to dismiss (Docket No. 21). The preliminary injunction hearing for the present case was held on March 6 and 7, 2001. During the preliminary injunction hearing the parties presented their witnesses and documentary evidence. On its behalf, Plaintiff presented the testimony of: (1) Ricardo Mayo, president and owner of Plaintiff, Doral; (2) Daniel Torre, marketing manager of Rimaco, Inc., ("Rimaco"), a local distribution company; (3) David Alejandro, one of Rimaco's medical representatives; and, (4) Santiago Martinez, a consumer that purchased the Genexotic product for his child. Plaintiff's also presented the following documentary evidence: (1) Doral's United States Patent and Trademark Office Registration Certificate 2,031,443 for Exotic H–C (Exhibit # 1); (2) a transparent box with an Exotic dropper vial and insert (Exhibit # 2); (3) a transparent box with a Zoto–HC dropper vial and insert (Exhibit # 3); (4) a transparent box with a Genexotic dropper vial and insert (Exhibit # 4); (5) a letter dated September 27, 2000, from Mary Boney Denison, Esq., to Mr. Rafael Arribas, President of PGD requesting that PGD immediately cease to use the Genexotic–HC mark and Doral's Exotic tradedress (Exhibit # 5); (6) a letter dated October 3, 2000, from Armando Llorens, Esq., to Mary Boney Denison, Esq., refusing Doral's September 27, 2000, request (Exhibit # 6); (7) promotional literature for the Exotic product (Exhibit # 7); (8) promotional material, comprised of container and single dose applicators, for Exotic's introduction to the Puerto Rico market (Exhibit # 8); and, (9) letter dated February 13, 2001, from Dr. Ildefonso Padro to Mr. David Alejandro informing him that during the last few months he had observed a series of allergic reactions in patients that have used the Genexotic product (Exhibit # 9).

On its behalf, PGD presented the testimony of Rafael Arribas, president of PGD. Defendant did not present any documentary evidence during the injunctive relief hearing.

After said hearing, the court suggested to the parties to file memoranda of law in support of their respective positions, including the merits of Defendant's motion to dismiss based on judicial estoppel grounds. The parties complied. (Dockets No. 33 and 34). Afterwards, PGD and Doral filed a joint motion stipulating a series of facts. (Docket No. 27).

## II. Findings of Fact

1. Since 1993, Doral has continuously used the Exotic–HC ("Exotic") trade-

mark in Puerto Rico for its prescription *otitis externa* medication.

2. Doral registered Exotic with the United States Patent and Trademark Office on January 21, 1997, U.S. Trademark Reg. No. 2,031,443. Until April 1996, the medication had been sold under the name Exxotic–HC; thereafter, the product has been sold under the registered trademark name Exotic–HC.

3. During the second semester of the year 2000, PGD introduced Genexotic–HC ("Genexotic") as a generic to Exotic in the Puerto Rico market.

4. Exotic and Genexotic are prescription drugs that treat the same condition (otitis externa) and have the exact same active ingredients, precautionary indications and counterindications, but different inactive ingredients.

5. PGD knew that Exotic was Doral's registered trademark at the time it introduced Genexotic in Puerto Rico.

6. To the best of PGD's knowledge, Doral is the only entity that uses the word "Exotic" as part of its trademark in the pharmaceutical industry. (Stipulated fact B, Docket No. 27).

7. The Exotic trademark was devised by Ricardo Mayo from two components: (1) "Ex" which corresponds to the word "external" and (2) "otic" which corresponds to ear channel.

8. The Exotic name was selected after a long and expensive process of trial and error that culminated with the registration of the federal trademark.

9. Doral sells its products in Florida, Central America, the Bahamas and Puerto Rico.

10. Rimaco, Inc. ("Rimaco") is the exclusive distributor since 1993 of Doral products in Puerto Rico, including Exotic.

11. Rimaco introduced Exotic in Puerto Rico and aggressively promotes and markets Exotic, currently using a sales force of approximately 10 to 12 salesmen.

12. Rimaco devised and undertook successful and extensive promotional strategy to introduce Exotic in the Puerto Rico market; a force of nine (9) medical representatives regularly visit physicians to promote the Exotic product.

13. PGD knew that Exotic was being actively marketed at the time Genexotic was introduced in the market. (Stipulated fact A, Docket No. 27).

14. Rimaco is a Puerto Rico Corporation and Doral is a Florida corporation. Ricardo Mayo is the owner and president of both corporate entities and neither company is a shareholder in the other. Both entities have different boards of directors and are not subsidiaries of each other. Mr. Ricardo Mayo and his son constitute a majority in the board of directors of both companies.

15. Rimaco distributes non-Doral products for over twenty companies in Puerto Rico. Doral does not distribute all of its products through Rimaco. Doral and Rimaco have a close non-litigating relationship.

16. Llorens Pharmaceutical filed a lawsuit against Rimaco before the Puerto Rico courts.

17. Doral was the owner of the Novagesic product that was the object of the Llorens litigation[1]. Ricardo Mayo was not directly involved in the Llorens litigation, although he was

---

1. *Llorens Pharmaceutical Corp. v. Propharma, Inc. and Rimaco, Inc.*, KDP 95–1016(804) (1995), San Juan, Superior Court of Puerto Rico.

aware of the litigation in his capacity as president and owner of Rimaco. Mr. Daniel Torre, Rimaco's marketing manager was directly involved in Rimaco's defense.

18. Rimaco argued and was able to establish in the local *Llorens* litigation that confusion was not possible between a prescription drug and an over the counter drug, the latter not requiring a prescription and kept outside of the area where prescription drugs are dispensed. (Conclusion of fact # 11, *Llorens* litigation) [2]

19. Exotic and Genexotic marks are identical but for the prefix "Gen".

20. The labeling of Genexotic does not contain an explicit statement that Genexotic is a comparable or similar product to Exotic. (Stipulated fact D, Docket No. 27).

21. The Exotic and Genexotic vials use very similar font, a transparent case and both products have virtually identical package inserts, and similar shades of blue, that, to the layperson's eye, appear identical. PGD chose to use a 10–milliliter dropper vial rather than a 5–milliliter dropper vial for its Genexotic product, partly for the reason that Doral uses a 10–milliliter dropper vial.

22. Brand pharmaceutical products are subject to substitution by generic products irrespective of the name, trade dress and label of the generic product. (Stipulated fact E, Docket No. 27).

23. Exotic and Genexotic use the same types of distribution channels. Exotic and Genexotic target the same class of ultimate purchasers, the consumers. However, the physicians make the decision to prescribe Exotic, it is typical-

ly pharmacists who offer to consumers the generic substitute Genexotic, upon the pharmacists own initiative, upon the consumer's request, or pursuant to guidelines set forth by the health plan underwriting the prescription drug and or covering the patient.

24. Accordingly, Doral promotes its Exotic product primarily but not exclusively to physicians, and secondarily to drug stores and to drug wholesalers known as "Droguerias". For its part, PGD promotes Genexotic directly to drugstores and drug wholesalers known as "Droguerias", but not to physicians.

25. Both Doral and PGD use printed material to promote Exotic and Genexotic, while Doral also uses samples.

26. Doral has received several complaints from physicians regarding the Genexotic product.

27. Zoto–HC is a prescription otitis externa medication available in the Puerto Rico market that competes with Exotic, has the same active and inactive ingredients as Exotic but has a very different mark, trade dress and package insert than Exotic.

28. PGD's Genexotic mark does not resemble Zoto–HC's mark, tradedress and package insert.

29. Defendant received a September 27, 2001, letter from counsel for Doral requesting that PGD cease using the Genexotic–HC mark and Doral's Exotic tradedress immediately. Doral received a response letter dated October 3, 2000, from counsel for PGD refusing to acquiesce to Doral's September 27, 2000, request.

30. PGD's product Genexotic is priced at least 30% below Doral's price of $12.95 per unit.

---

**2.** The Court in the *Llorens* litigation concluded as a matter of law, that no confusion could be created at the consumer level, between a prescription drug and an over the counter medicine. (Conclusion of Law # 2, *Llorens* judgment).

31. The term generic is recognized by doctors, pharmacists and consumers alike.

32. PGD's intent in choosing the name Genexotic and attendant trade dress was to leverage the established name recognition of the registered trademark. Exotic among prospective purchasers such as pharmacists, wholesalers, physicians and the general public.

33. There is no evidence of actual confusion between Genexotic and Exotic at the pharmacy level.[3]

34. There is no evidence of actual confusion among wholesalers (Droguerias).

35. The only evidence of potential confusion among pharmacists presented by Doral, and cognizable by this Court, was testimony that in Farmacia Americana in Santurce, both the Exotic and the Genexotic are placed next to each other under the letter "E", without any separation between them, despite the fact that such pharmacy places its inventory in alphabetical order.

36. It is possible for the package insert to be shifted so that it blocks the prefix "Gen".

## III. Preliminary Matters.

### A. *The judicial estoppel doctrine.*

■ Initially, the Court turns to Defendant's claim that the *Llorens* litigation, by judicial estoppel, bars plaintiff from alleging confusion in the instant case. Plaintiff's distributor, Rimaco, argued a different position in the *Llorens* litigation averring with success that products similarly situated could not cause confusion

(no confusion as to two products, one of which is a prescription drug). On first impression, the argument seems valid, but on close scrutiny, the argument ultimately fails. The Court explains. The First Circuit has held that "under certain circumstances, the doctrine of judicial estoppel precludes 'parties' in civil litigation from asserting legal or factual positions inconsistent with the positions that they took in prior proceedings.". *See Faigin v. Kelly,* 184 F.3d 67, 82 (1st Cir.1999). Furthermore, the First Circuit has held that said doctrine cannot be applied in a reflexive or self-executing manner. *See Desjardins v. Van Buren Community Hosp.,* 37 F.3d. 21 (1st Cir.1994); *Brooks v. Beatty,* 25 F.3d 1037, 1994 WL 224160 (1st Cir.1994).

The Court first must conclude that the affirmative defense of judicial estoppel may not be asserted by Defendant PGD against Plaintiff Doral Pharmamedics. Doral was not a party to the purportedly preclusive litigation. There was no proof that Plaintiff substantially controlled the litigation nor that it shared a sufficient identity of interest with its sister company, to warrant the equitable application of the doctrine of virtual representation. The First Circuit has held that res judicata "can sometimes operate to bar the maintenance of an action by persons who, technically, were not parties to the initial action (to which preclusive effect is attributed)", but that "nonetheless, [the Court] appreciate[s] that this is a murky corner of the law and caution[s] the district courts to tread gingerly in applying res judicata to nonparties." *Gonzalez v. Banco Cent. Corp.,* 27 F.3d 751, 757 (1st Cir.1994). The Court notes that *Gonzalez* was decided in the context of res judicata. The First Circuit has not set forth specific guidelines

---

**3.** Several physicians have complained to Doral (whether truthfully or falsely) that pharmacists have dispensed Genexotic to patients that were specifically prescribed the branded Exotic product.

for assertion against a non-party of the defense of collateral estoppel, which, although not identical to res judicata, has been said "to share a family resemblance". *Id.* In their respective briefs, both parties implicitly accept the applicability of *Gonzalez*. Hence, the Court must set forth the corresponding analysis.

■ The Court finds that Defendant PGD did not meet its burden of proof as to the allegation that Plaintiff Doral Pharmamedics or Mr. Ricardo Mayo "called the shots", *Gonzalez*, 27 F.3d at 758, or exercised "substantial control", *Gonzalez*, 27 F.3d at 759, over the prior litigation. Doral, Plaintiff in the instant case, and Rimaco, Defendant in the purportedly preclusive litigation, are sister companies under the common control of Mr. Ricardo Mayo and his son, who constitute a majority of the respective boards of directors. Both corporations are separate and distinct entities that were incorporated in different jurisdictions, and do not have reciprocal ownership interests. Rimaco distributes non-Doral products for over twenty companies in Puerto Rico. Doral does not distribute all of its products through Rimaco; however, Doral and Rimaco have a close non-litigating relationship. While Mr. Mayo certainly demonstrated extensive familiarity with the prior proceedings, he also explicitly testified that the relevant decision-maker was Rimaco's Marketing Manager, Daniel Torre. This critical fact was irrefuted. Under the above stated factual scenario, it is not immediately obvious to the Court that Mr. Mayo nor anyone connected to Doral exercised substantial control over the prior litigation. Nor did PGD produce any rebuttal evidence, as is their burden, tending to prove otherwise.[4]

Second, leaving aside the non-party obstacles, judicial estoppel is quite simply not applicable, because the issues resolved in

---

4. Defendants also invoke, in the alternative, the equitable theory of "virtual representation", which does not require identity of the parties or substantial control by the bound party, but rather depends on a commonality of interest. The First Circuit has limited the application of the theory of virtual representation to those cases where there has been "tactical maneuvering designed to exploit technical non-party status in order to obtain multiple bites of the litigatory apple" or in cases where "a non party has consented to be bound by the result of a prior action." *Gonzalez*, 27 F.3d at 761. The party arguing this theory has the burden of showing an identity of interests between the non-party and the original party. *Id.* Nonetheless, mere similarity in interests and a quantum of representation is insufficient to trigger this theory. *Gonzalez*, 27 F.3d at 760.

It is important to note that "contemporary caselaw has placed the theory of virtual representation on a short tether, significantly restricting its range [citation omitted] ... the theory of virtual representation must be kept within strict confines" in order to avoid infringing on the Due Process Clause which guarantees a day in Court not a *virtual* day in Court. *Id. See also Crane v. Department of Agriculture*, 602 F.Supp. 280, 287 (D.Me. 1985), which discusses the critical treatment given by the First and Fifth Circuits to virtual representation theory.

The theory of "virtual representation" is inapplicable to the present case because PGD did not meet its burden of establishing that Doral, which was not the owner or distributor of Novagesic, had sufficient common interests with Rimaco or any interest in the Llorens litigation. The only common interest that the Court can discern is that Rimaco's victory inured to the economic benefit of Mr. Ricardo Mayo, who is also the owner of Doral. Notwithstanding, it is difficult to argue that the Court should apply this equitable doctrine to Doral, which is a manufacturer of pharmaceuticals, vis-a-vis Rimaco, which is a distributor. Essentially, if the position purportedly asserted by Rimaco, that pharmacists can never be confused among medical products, were to bind Doral, the latter would lose its right to go to court to defend any of its trademark rights, no matter how flagrant the alleged violation would otherwise be. It is unlikely that Doral would have consented to be bound by such an outcome, and in any

the prior litigation are not sufficiently similar to those raised in the instant lawsuit. The Supreme Court has specifically held that application of collateral estoppel requires that the issues must be *"identical in all respects* with that decided in the first proceeding." (emphasis added). *Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591, 599–600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948). In the prior local lawsuit, then-defendant Rimaco convinced the Court that no confusion existed between a prescription drug, named Dologesic, and an over the counter drug, named Novagesic, because the latter does not require a prescription and is kept outside of the area where prescription drugs are dispensed. The instant lawsuit involves two similarly named **prescription** medicines that could potentially be stored side-by-side. According to Plaintiff, these prescription medicines are in effect, typically stored side-by-side.[5] While the San Juan Superior Court framed its judgment as a broad proclamation of law, this Court must refer to the clearly and substantially different facts underlying the prior legal determination (that medical professionals, pharmacists and/or doctors in medicine, are incapable of confusion), and conclude that they are not sufficiently similar to deny Plaintiff its day in court. *See Meza v. General Battery Corp.,* 908 F.2d 1262, 1266 (5th Cir.1990) (approving concept of collateral estoppel but noting the due process concerns involved, requiring that every party is entitled to a "day in court"); *Gonzalez v. Banco Cent. Corp.,* 27 F.3d at 751 (tracing expansion and subsequent contraction in judicial application of collateral estoppel responding to due process considerations).

Finally, although facially Doral has been "playing fast and loose with the courts" and/or that "intentional contradiction is being used as a means of obtaining unfair advantage", the Court received no evidence to substantiate this conclusion. *See Franco v. Selective Insurance Company,* 184 F.3d 4, 9 (1st Cir.1999); *Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208, 212 (1st Cir.1987). "Unfair advantage" generally requires that a party have "succeeded previously with a position directly inconsistent with the one it currently espouses." *Lydon v. Boston Sand & Gravel Co.,* 175 F.3d 6, 12 (1st Cir. 1999). While the Superior Court's judgment was clearly premised on the sophistication of the prospective purchasers, it is not "crystal clear" that Doral's prior success "depended conceptually" on the legal conclusion that medical professionals were incapable of confusion, *see Franco v. Selective Ins. Co.,* 184 F.3d 4, 9 (1st Cir. 1999), or whether other theories based on the factual predicates may have otherwise succeeded. Moreover, as the First Circuit has stated, judicial estoppel "is not an automatic bar against inconsistent positions", *Franco,* 184 F.3d at 9, but rather "there are plenty of cases where a party is free to assert a position from which it later withdraws." *Desjardins v. Van Buren Community Hosp.,* 37 F.3d 21, 23 (1st Cir.1994). Defendant failed to satisfy its burden, as the party asserting collateral estoppel, of establishing the unfairly advantageous (or manipulatively intentional) nature of the purported inconsistency.

## IV. Petition for a preliminary injunction

### A. Standard for Preliminary Injunction

The Court of Appeals for the First Circuit has developed a quadripartite test for

---

case, the burden to prove otherwise lies on Defendant in the instant case.

5. The Court cautions that the evidence of only one pharmacy was offered and hence, the Court can not conclude that a pattern exists as to side by side storing of the products.

determining when a party is entitled to a preliminary injunction. This Circuit has repeatedly held that a preliminary injunction should be granted if the plaintiff demonstrates that (1) there is a reasonable likelihood of eventual success on the merits; (2) it will suffer irreparable injury if the injunction is not granted; (3) a balance of equities favors the plaintiff; and (4) the public interest favors entry of a preliminary injunction. *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996) (citing *Weaver v. Henderson*, 984 F.2d 11, 12 n. 3 (1st Cir. 1993)). *See also Narragansett Indian Tribe, v. Guilbert*, 934 F.2d 4, 5–6 (1st Cir.1991); *Geoffrey, Inc. v. Toys 'R Us (Nosotros Somos Los Juguetes), Inc.*, 756 F.Supp. 661, 664–65 (D.P.R.1991). The most critical part of the formulation is whether the plaintiff is likely to succeed on the merits. *Weaver*, 984 F.2d at 12.

A preliminary injunction is available in trademark infringement cases under the Lanham Act. Section 34 of the Lanham Act, 15 U.S.C. § 1116, specifically provides that:

"The several courts vested with jurisdiction of civil actions arising under this Act shall have the power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under section 1125(a) of this title. Any such injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction. Any such injunction granted upon hearing, after notice to the defendant, by any district court of the United States, may be served on the parties against whom such injunction is granted anywhere in the United States where they may be found, and shall be operative and may be enforced by proceedings to punish for contempt, or otherwise, by the court by which such injunction was granted, or by any other United States district court in whose jurisdiction the defendant may be found."

In the context of trademarks, if the plaintiffs demonstrate a likelihood of success on the merits, two consequences follow: (1) there is a very strong likelihood that plaintiffs will suffer irreparable injury absent an injunction, *see Omega Importing Corp. v. Petri–Kine Camera Co., Inc.*, 451 F.2d 1190, 1195 (2d Cir.1971) (when likelihood of confusion is shown, and plaintiff would thereby be likely to prevail, "injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows"); and (2) the granting of a preliminary injunction is presumptively considered to be beneficial to the public interest, "given the societal value of full disclosure and fair competition, together with the policy of the law to provide at least minimal protection to established trade names ...." *Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 700 (1st Cir.1987); *see also Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F.Supp. 994, 1015 (D.Mass.1988) ("Preventing consumer confusion is clearly in the public interest."). "[H]owever, in a trademark case, **the key issue is the likelihood of success on the merits because the other decisions will flow from that ruling.**" *Keds Corp. v Renee Intern. Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989) (emphasis ours). Thus, if the plaintiffs can show a likelihood of success on

the merits, either on their trademark infringement or dilution claim, public policy dictates that a preliminary injunction shall issue.

Defendant avers that the Court converted the preliminary injunction hearing to include the merits of Plaintiff's prayer for a permanent injunction and the issue of liability. (Docket No. 34). Defendant's assessment of the proceedings held at the preliminary injunction hearing is simply incorrect.

While a court has the power to determine both the merits of the complaint and a request for temporary relief at a single hearing, exercise of that power is tempered by the requirement that court provide "clear and unambiguous notice"[6] to the parties before or after commencement of hearing that such action is contemplated. Fed.R. Civ. Proc. Rule 65(a)(2). *See T.M.T. Trailer Ferry, Inc. v. Union De Tronquistas De Puerto Rico*, 453 F.2d 1171, 1172 (1st Cir.1971).

Rule 65(a)(2), *supra*, clearly states that: "[b]efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which becomes part of the record on the trial and need not be repeated upon the trial...." *See Boston Celtics Limited Partnership v. Shaw*, 908 F.2d 1041 (1st Cir.1990). (The court consolidated the proceedings on the merits of the case with the hearing on the preliminary injunction motion, pursuant to Fed.R.Civ.P. 65(1)(2)).

In *Caribbean Produce Exchange v. Secretary of HHS*, 893 F.2d 3 (1st Cir.1989), the First Circuit Court determined that the District court erred in consolidating proceedings seeking preliminary injunctive relief with those seeking permanent injunctive relief, and issuing permanent injunction because there was no notice of consolidation to the parties. Therefore, significant questions remained unaddressed or inadequately developed by the District court. Furthermore, the court emphasized that:

> "... the Supreme Court in *University of Texas v. Camenisch*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981), noted the general inappropriateness of a court's issuance of a final judgment at the preliminary injunction stage, citing, *inter alia, Santiago*. The Court quoted then Circuit Judge Stevens, " '[T]he parties should normally receive clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases' (citations omitted)."

*Caribbean*, 893 F.2d at 6.

"Rule 65(a)(2) permits a trial court to order that the trial on the merits be advanced and consolidated with a hearing on an application for a preliminary injunction. Although no formal order of consolidation is required, it is well-settled that there must be some notice to the parties that the trial court will rule on the merits following the preliminary injunction proceeding." *H & W Industries, Inc. v. Formosa Plastics Corp., U.S.A.*, 860 F.2d 172, 176 (5th Cir. 1988). *See Nationwide Amusements, Inc. v. Nattin*, 452 F.2d 651, 652 (5th Cir.1971).

---

**6.** Language used by the Supreme Court in *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) citing *Pughsley v. 3750 Lake Shore Drive Cooperative Building*, 463 F.2d 1055, 1057 (7th Cir.1972).

Based on the aforementioned, the Court finds that at the present stage of the proceedings in the above captioned case, the Court is limited to consider the merits of the case only as to the preliminary injunction requested by Plaintiff.[7] Therefore, the Court will rule based on the standard of a preliminary injunction as set forth above.

### B. Elements of Trademark Infringement Claim

■ To succeed in a trademark infringement claim Plaintiff must establish that: (1) he uses and thereby owns a mark; (2) the defendant is using the same or a similar mark; and (3) the defendant's use is likely to confuse the public, thereby harming the plaintiff. *Star Financial Services, Inc. v. AASTAR Mortgage Corp.,* 89 F.3d 5, 9 (1 Cir.1996).

The third element of the trademark cause of action, likelihood of confusion, is the central issue in finding trademark infringement. *International Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center,* 103 F.3d 196, 200 (1st Cir.1996); *Veryfine Products, Inc. v. Colon Brothers, Inc.,* 799 F.Supp. 240, 250 (D.P.R.1992). Section 32(1)(a) of the Lanham Act, which governs claims for infringement of registered marks, in its pertinent part states that: "[a]ny person who shall, without the consent of the registrant use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;" 15 U.S.C. § 1114(1)(a); *Nutrasweet Co. v. Venrod Corp.,* 982 F.Supp. 98

(D.P.R.1997). There are three kinds of confusion proscribed by the Lanham Act:

The first is simple product confusion, which occurs when consumers might purchase a defendant's infringing product thinking it was plaintiffs'. The other type of confusion is that of source or sponsorship, which arises when a consumer might believe that the plaintiff has approved or sponsored the defendant's product. The third main type of confusion is known as subliminal trademark association, which exists when a defendant is able to gain a foothold in the plaintiff's market by exploiting subliminal or conscious association with plaintiff's protected name, mark or trade dress. *See Veryfine Products, Inc.,* 799 F.Supp. at 251.

In trademark infringement cases, the First Circuit has consistently applied the eight factor test set forth in *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981), which requires consideration of: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship of the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the mark. *See also Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 29 (1st Cir.1989); *Star Financial Services,* 89 F.3d at 9; *Volkswagenwerk Aktiengesellschaft,* 814 F.2d 812, 817 (1st Cir.1987). The likelihood of confusion must be substantial, *Star Financial Services,* 89 F.3d at 10, and these factors may not be applied in a mechanic or formulaic manner. Moreover, as the First Circuit noted recently, in discussing the "eight-factor" test, "this

---

**7.** The Court further set for hearing the preliminary injunction request as opposed to the permanent injunction (Docket No. 23).

compendium does not conform easily to the peculiar facts of this case, [and] it is not intended to be either all-encompassing or exclusive." *Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO, v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir.1996).

Essentially, Defendant rests its case on the proposition that pharmacists, the true dispensers of prescription medicaments, are so sophisticated and skilled at distinguishing between products that they are, as a matter of law, incapable of confusion. It is important to lay out the Court's understanding, based on the evidence presented (and the omitted evidence) at the preliminary injunction hearing.

The initial purchase decision is made by the physician, who writes out a prescription for the Exotic–HC product. The physician has various alternatives. He may prescribe that no generic substitutes shall be permitted; he may prescribe the generic substitute[8]; or he may simply remain silent on the matter. The consumer then visits a pharmacy, where the patient is attended by a licensed professional pharmacist. Upon receipt of the prescription slip, the pharmacist may on his own initiative, upon customer inquiry, or pursuant to health plan requirements, advise the consumer that there is a generic alternative that is cheaper, but equally effective. After the consumer chooses, the pharmacist proceeds to select the required drug from the storage shelves, which are out of reach of the customer. The pharmacist then physically delivers the medicine to the consumer, who typically uses it at a later time. Unlike the typical off-the-shelf consumer product, the decision to purchase the prescription drugs, and the implementation thereof, are in the capable hands of specially licensed and trained professionals,

who Defendant argue are not likely to be confused.

The First Circuit has tackled in a prior decision the issue of whether there is likelihood of confusion amongst medical professionals from the use of similar or identical trademarks. In *Astra Pharmaceutical v. Beckman Instruments*, 718 F.2d 1201 (1st Cir.1983), the First Circuit stated that:

"Perhaps the most critical factor that weighs against [plaintiff] in our consideration of this issue is the sophistication of the class of prospective purchasers of the subject products. If likelihood of confusion exists, it must be based on the confusion of some relevant person; *i.e.* a customer or purchaser. And there is always less likelihood of confusion where goods are expensive and purchased after careful consideration. [cites omitted] ... Astra's salesperson are also highly trained in order to be able to communicate with the pharmacists and anesthesiologists who will be deciding whether or not to buy their products. These sales person make it crystal clear who manufactures the drugs, as the hospital will always make a careful determination of the source of the drug before it will be listed on the hospital formulary. After all, these drugs may be used in life and death situations, and the hospital, being in a position of trust, must be extremely cautious about what medicines it administers to its patients, as well as their source.

In short, it is simply inconceivable the purchasers of the parties' respective products could be confused as to the source of these products...."
*Astra*, 718 F.2d at 1206–7.

Doral submitted no evidence in support of its contention that pharmacists are

**8.** No proof was offered that physicians were confused between the two products.

likely to be confused. Furthermore, Doral failed to present this Court with evidence as to actual confusion among "droguerias" or physicians regarding the two prescription drugs. Typically, physicians are the first to find themselves in the position of making a choice between the two medicaments. Therefore, Doral had to produce evidence as to actual or likely confusion among physicians when prescribing Genexotic or Exotic, as well as among pharmacies.[9] Doral failed to produce such evidence. Accordingly, Doral has not established a likelihood of success in proving the likelihood of confusion, an essential element of its claim. The Court finds that there is no substantial likelihood of confusion among physicians or pharmacists as to dispensing to the consumer either of the two products.

## C. Ruling

In conclusion, the Court finds that Doral has not proven the most critical requirement for the issuance of a preliminary injunction. That is, Doral failed to establish that it is likely to succeed on the merits of the present case, as it has not presented this Court with evidence pursuant to the "likelihood of confusion" factor established by the Court of Appeals for the First Circuit, in its "eight—factor" test. *See Boston Athletic*, 867 F.2d at 35. *See also Keds Corp.*, 888 F.2d at 222.

Further, the Court is precluded from considering the merits of the complaint at this time, due to the fact that no timely, unambiguous order as to consolidation of preliminary injunction hearing and trial on the merits, was issued or notified to the parties. *Caribbean Produce Exchange v. Secretary of HHS*, 893 F.2d at 6. Therefore, the Court limits its determination to

the preliminary injunctive relief requested by Plaintiff.

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Doral Pharmamedics, Inc.'s, application for a preliminary injunction.

IT IS SO ORDERED.

---

9. The Court notes that at the physician level, confusion between two prescription drugs is unlikely, because Genexotic is merchandised almost exclusively at pharmacists and "droguerias" level.